

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-76,737

**KWAME A. ROCKWELL, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

### ON DIRECT APPEAL
### FROM THE CRIMINAL DISTRICT COURT NUMBER FOUR, TARRANT COUNTY

*WOMACK, J., delivered the opinion of the unanimous Court.*

In January 2012, a jury convicted the appellant of the murder of Daniel Rojas in the course of committing robbery, a capital offense.[1] Pursuant to the jury's answers to the special issues, the trial court sentenced the appellant to death.[2] Direct appeal to this Court is automatic.[3] The appellant raises twenty-one points of error. Finding no reversible error, we affirm.

---

[1] TEX. PENAL CODE § 19.03(a)(2).

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *Id.*, § 2(h).

## I. Sufficiency of the Evidence

In his first point of error, the appellant argues that the evidence was insufficient to support his conviction at the guilt phase of the trial. Specifically, the appellant argues that the State failed to prove that he, as opposed to a co-conspirator, was the person who shot and killed Rojas, or that he was guilty as a party. There was sufficient evidence to support a rational juror's finding that the appellant was at least a party to the offense, if not the principal actor.

## A. Standard of Review

When assessing whether evidence is legally sufficient to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[4] This standard accounts for the factfinder's duty "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."[5] Therefore, in analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict."[6]

Our review of "all of the evidence" includes evidence that was properly and improperly admitted.[7] When the record supports conflicting inferences, we presume that the factfinder

---

[4] *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

[5] *Ibid*.

[6] *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Cr. App. 2007).

[7] *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Cr. App. 2001).

resolved the conflicts in favor of the prosecution and defer to that determination.[8] Direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."[9]

When the trial court's charge authorizes the jury to convict on more than one theory, we shall uphold the verdict of guilty if the evidence is sufficient on any one of those theories.[10]

## B. Applicable Law

A person commits murder if he intentionally or knowingly causes the death of an individual.[11] A person commits capital murder if he intentionally commits murder in the course of committing or attempting to commit any of several offenses, including robbery.[12]

A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.[13] A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.[14] If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all

---

[8] *Jackson*, 443 U.S., at 326.

[9] *Hooper*, 214 S.W.3d, at 13.

[10] *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Cr. App. 2004).

[11] TEX. PENAL CODE § 19.02(b)(1).

[12] *Id.*, § 19.03(a)(2).

[13] *Id.*, § 7.01(a).

[14] *Id.*, § 7.02(a)(2).

conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.[15]

A reviewing court may look to "events before, during, and after the commission of the offense" to determine whether an individual is a party to an offense, and it may rely on circumstantial evidence to prove party status.[16] Although each fact "need not point directly and independently to the guilt of the appellant," the cumulative effect of the incriminating facts must be sufficient to support the conviction.[17]

### C. Relevant Facts and Analysis

The appellant was the co-owner of a used car business located next to a Valero gas station and convenience store in Fort Worth. The car business was struggling and in danger of losing the lease on the property, but the appellant and several other employees noticed the Valero next door was always busy and did a big check-cashing business. The men decided to commit robbery at the convenience store because they thought a large amount of cash was stored there.

Appellant's co-conspirator, Chance Smith, testified that the appellant set up a meeting with Smith and told him to bring another man because the appellant wanted them to help him commit the robbery. The appellant told the participants who would be involved and what their roles would be. He brought walkie-talkies to the car lot before the offense and said they were to be used during the robbery. The appellant and his co-conspirators engaged in several botched

---

[15] TEX. PENAL CODE § 7.02(b).

[16] *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Cr. App. 2012) (*citing Wygal v. State*, 555 S.W.2d 465, 468-69 (Tex. Cr. App. 1977)).

[17] *Guevara*, 152 S.W.3d, at 49.

attempts at the robbery in the days leading up to the offense. The appellant told Smith that he (the appellant) would carry a gun so he could shoot anyone who recognized them, and another man would carry a gas can to burn the store, eliminating any evidence. There was testimony that the appellant was known to carry a gun frequently.

On March 23, 2010, Valero employee Daniel Rojas arrived at the convenience store early in the morning to open for the day and let a Mrs. Baird's delivery driver, Jerry Burnett, into the store to restock the shelves. Surveillance video showed that around 6:20 a.m., three men wearing dark clothing and black ski masks entered the store. The first man carried a gun, the second man carried a bag, and the third man carried a red gas can and stayed near the front door.

The first man shot Burnett in the head where he stood in an aisle of the store, and then the first and second men forced Rojas to open the cash register and give them a large bundle of cash that was in a freezer in the store's office area. The first man then shot and killed Rojas in the office area. A customer pulled up outside, and the three masked men quickly left. As they ran out, the first man pointed his gun at the customer outside but did not shoot.

The man with the gun and the man with the bag were about the same height, but the man with the gun had dark skin and the second man had light skin. The shooter used his left hand to shoot both Burnett and Rojas. The appellant was a left-handed, dark-skinned African American; Randy Seibel was a right-handed, light-skinned Caucasian; and Tyrone Thomas was a right-handed African American who was noticeably shorter than the other two men.

When police arrived, Burnett was still alive. He was taken to the hospital, where he died ten days later.

Three cars belonging to the appellant, Smith, and Tim Thomas (another accomplice) were

seen on surveillance video arriving at Smith's apartment between 7:05 a.m. and 7:50 a.m. on the morning of the offense. The appellant did not return to work at the car lot after the offense.

Four days later, the appellant was approached by uniformed officers in San Antonio while he was sitting in his truck. He jumped out of the vehicle and ran away. He barricaded himself in a convenience store restroom, yelling that he would kill himself. When police broke the door open, the appellant was holding a piece of broken glass to his throat. As they handcuffed him, the appellant told police, "Just f------ kill me, man. I'm going to die in there anyway."

The evidence at trial showed that the day before the offense, the appellant, who owed his ex-wife a large amount of money, told her that he would pay her some of it the next day. Someone from the car lot also arranged to have the car Smith said was used in the offense towed from where it was parked at the appellant's cousin's vacant house later on the day of the offense. Smith testified that the appellant met him after the offense and gave him money to pay the tow-truck driver.

In the river behind the appellant's apartment complex was found a black, hooded sweatshirt, similar to those seen on the surveillance video from the convenience store. On it was a partial DNA profile from which the appellant could not be excluded.

The appellant admits that "the jurors could reasonably conclude [the appellant] was present at the scene of the offense,"[18] but he argues that, other than the accomplice testimony, there was no "direct evidence" that he brandished the weapon used to kill Rojas.[19] However, the jury charge provided three theories that allowed for conviction, only one of which required the

---

[18] Appellant's Brief at 11.

[19] *Ibid.*

appellant to be the actual shooter.[20] The State was not required to prove the appellant was the shooter, because he could be found guilty as a party to the offense.

There was evidence that the appellant solicited, directed, and aided in the commission of this offense by holding planning meetings, assigning roles, providing materials used in the offense, and by being present at the scene of the offense (which the appellant admits was a reasonable conclusion).

In accordance with *Guevara*, we will uphold a verdict of guilty if the evidence is sufficient for any one of the theories on which the jury was authorized to convict. A rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We overrule the appellant's first point of error.

## II. Sufficiency of the Evidence - Future Dangerousness

The appellant's nineteenth point of error is that the evidence was legally insufficient to support the jury's finding of a probability that he would commit future criminal acts of violence that would constitute a continuing threat to society.[21] Finding ample evidence to support the jury's verdict, we overrule this point of error.

---

[20] The jury charge included the instruction that the jury should find the appellant guilty if it found beyond a reasonable doubt that:

(1) the appellant, either acting alone or as a party, intentionally caused the death of Daniel Rojas by shooting him with a deadly weapon in the course of committing or attempting to commit robbery of Daniel Rojas;

(2) the appellant, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid Randy Seibel or Chance Smith or Tim Thomas or Tyrone Thomas to intentionally cause the death of Daniel Rojas by shooting him with a deadly weapon and the said Randy Seibel or Chance Smith or Tim Thomas or Tyrone Thomas was in the course of committing or attempting to commit robbery of Daniel Rojas; or

(3) the appellant entered into a conspiracy with Randy Seibel or Chance Smith or Tim Thomas or Tyrone Thomas to commit the offense of robbery and that in the attempt to carry out this agreement, one of the co-conspirators did then and there intentionally cause the death of Daniel Rojas by shooting him with a deadly weapon, and such offense was committed in furtherance of the robbery, and was an offense the appellant should have anticipated as the result of carrying out the agreement.

[21] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1).

We assess the sufficiency of future-dangerousness evidence in the light most favorable to the jury's findings.[22] We must determine whether any rational trier of fact could have found a probability that the defendant would commit future criminal acts of violence that would constitute a continuing threat to society, and we shall reverse only if a rational jury would necessarily have had a reasonable doubt about this probability.[23]

The special issue asks if a defendant would constitute a continuing threat whether in or out of prison without regard to how long the defendant would actually spend in prison if sentenced to life.[24] In other words, the issue concentrates on "the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person."[25] Some factors a jury may consider in determining future dangerousness include:

> 1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; 2. the calculated nature of the defendant's acts; 3. the forethought and deliberateness exhibited by the crime's execution; 4. the existence of a prior criminal record, and the severity of the prior crimes; 5. the defendant's age and personal circumstances at the time of the offense; 6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; 7. psychiatric evidence; and 8. character evidence.[26]

This list is not exhaustive. The jury is entitled to consider all the evidence at both the guilt and

---

[22] *Coble v. State*, 330 S.W.3d 253, 265 (Tex. Cr. App. 2010) (*citing Berry v. State*, 233 S.W.3d 847, 860 (Tex. Cr. App. 2007)).

[23] *Ibid.*

[24] *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Cr. App. 2010).

[25] *Coble*, 330 S.W.3d at 268.

[26] *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Cr. App. 1987). *Accord, Coble*, 330 S.W.3d at 269, n.24. (This list does not include characteristics of the prison system.).

punishment stages of trial.[27]

The jury heard evidence about the planning and forethought that went into this offense. The appellant met with his accomplices to plan their actions, made previous attempts to rob the owners of the same store, and even tested a substance designed to act like napalm before he attempted to burn down the house of the convenience store owners to force them to move the money. He set fire to their house while they were home. There was evidence the appellant was the leader in this offense, and he directed the other men as to their roles and how everyone should proceed.

There was evidence the appellant had threatened his ex-wife with a gun in their home after she found out he was cheating on her. On a separate occasion, he waited for his ex-wife at their daughter's school and, when she arrived, he pulled his daughter out of the car and threw DVD cases at his ex-wife, cutting her face.

Additionally, the jury heard evidence suggesting the appellant faked a suicide attempt in order to attempt an escape from the hospital, and jail officers found a "shank" under the appellant's bed in his jail cell.

There was evidence of the first four factors from *Keeton*, as well as an absence of evidence that he was acting under duress or domination at the time of the offense. When considered with evidence from the guilt phase about the callous nature of this murder, a rational juror could have found a probability that the appellant would commit future criminal acts of violence that would constitute a continuing threat to society. We overrule the appellant's nineteenth point of error.

---

[27] TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(1).

### III. Jury Selection

After examining venire members over seven weeks, the trial court qualified 48 from whom to select a jury. The appellant used his 15 statutorily allotted peremptory strikes and was granted two additional strikes by the court. In three points of error, he now argues that three of the venire members he struck should have been excused for cause.

### A. Standard of Review

A venire member may be challenged for cause for having a bias for or against the defendant, or against the law.[28] The trial court should grant a challenge for cause if these biases would be so strong as to substantially impair the panelist's ability to carry out his oath and follow the court's legal instructions.[29] The proponent of a strike does not meet his burden "until he has shown that the venireman understood the requirement of the law and could not overcome his prejudice well enough to follow it."[30]

When reviewing the grant or denial of a challenge for cause, we examine the record of the *voir dire* to determine if there is sufficient evidence to support the trial court's ruling.[31] Because the trial judge is present to observe the venire member's tone and demeanor, we give great deference to decisions made regarding venire members whose answers are vacillating, unclear, or contradictory.[32]

---

[28] TEX. CODE CRIM PROC. art 35.16; *see also Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Cr. App. 1998) (interpreting "bias against the law" to mean "refusal to consider or apply the relevant law").

[29] *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Cr. App. 2004).

[30] *Feldman v. State*, 71 S.W.3d 738, 747 (Tex. Cr. App. 2002).

[31] *Ibid*., at 744.

[32] *Ibid*.

To show harm from the erroneous denial of a challenge for cause, the appellant must show that the trial court's failure to strike a challengeable juror forced him to use a statutorily allotted peremptory strike on the challengeable juror, which left him unable to strike an objectionable juror who then sat on the jury.[33] Because the trial court in this case granted the appellant two peremptory strikes in addition to his statutory allotment of 15, the appellant must show that the trial court improperly denied at least three challenges for cause in order to show harm.[34]

### B. Anti-Parties Special Issue

In points of error three, four, and five, the appellant argues that the trial court erred in denying his challenges for cause to three venire members on the grounds that they could not answer "no" to the anti-parties special issue at punishment after returning a guilty verdict. The anti-parties special issue is required to be submitted to the jury at the punishment phase in cases in which the jury was given a parties instruction at the guilt phase of the trial. It asks whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.[35] We shall analyze the appellant's claim with respect to each of the three venire members below.

### C. Specific Challenges

**1. Knox.** In his third point of error, the appellant argues that Venire Member Knox

---

[33] *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Cr. App. 2007).

[34] *Ibid*.

[35] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(2).

should have been struck for cause because he was unable to follow the law with respect to the anti-parties special issue. Knox first stated that he understood the anti-parties special issue and would answer depending on whether the State proved it beyond a reasonable doubt or not. During questioning by the appellant, Knox said he could not imagine circumstances in which he would answer the question "no." This led to an extensive debate between the attorneys regarding the law of parties and the anti-parties special issue. Some of this was held in Knox's presence and some after he was excused from the courtroom. When he returned and was questioned again, he reiterated that it made sense to answer the question "yes" after having convicted a defendant at the guilt stage.

When the appellant challenged Knox for cause based on an inability to follow the law with respect to the anti-parties special issue, the judge said she thought Knox was confused and he had answered both ways, so Knox returned for additional questioning. Knox was provided with another explanation of the relevant law, and, in response to this final line of questioning, stated he could see circumstances where the answer would be "no." Knox also said he would not automatically answer "yes" to the anti-parties special issue, but would listen to the facts and evidence to guide him. The judge then denied the challenge for cause.

We afford great deference to the trial court in determining whether vacillating venire members are fit to serve as jurors.[36] We overrule the appellant's third point of error.

**2. Ranney**    In his fourth point of error, the appellant argues that Venire Member Ranney should have been struck for cause because she would always answer "yes" to the anti-parties special issue. During Ranney's *voir dire* examination, she first said she would be able to

---

[36] *Feldman*, 71 S.W.3d, at 744.

answer the question "no" if there was not evidence the defendant had anticipated a killing. Then, in response to appellant's questioning, she said she would always answer "yes."

When the appellant challenged Ranney for cause, the court offered an opportunity to bring her back to the courtroom for additional questioning because she answered the question two different ways. Both sides declined to question her further. The judge denied the challenge for cause. We find that Ranney's potential prejudices were not so clear as to make the trial court's decision an abuse of discretion. We overrule the appellant's fourth point of error.

**3. Castleberry**       In his fifth point of error, the appellant argues that Venire Member Castleberry should have been struck for cause because she was unable to follow the law with respect to the anti-parties special issue. Castleberry first indicated she could do a fresh analysis for the anti-parties special issue based on the evidence, and she would not answer it automatically based on the result at the guilt phase of the trial. Upon further questioning by the appellant about whether the answer would automatically be "yes," Castleberry qualified her response by saying, "If he took a gun to the crime, a loaded gun, that's a possibility, yes." She never made an unqualified statement that she would always answer this special issue "yes."[37]

At the conclusion of Castleberry's examination, the judge denied the appellant's challenge for cause. We find that Castleberry's potential prejudices, if any, were not so clear as to make the trial court's decision an abuse of discretion. We overrule the appellant's fifth point of error.

The appellant has not shown that the trial court improperly denied at least three

---

[37] Neither the State nor this Court have been able to locate the statement the appellant included in his brief in which Venire Member Castleberry appears to say she would always answer yes to this special issue if she had already convicted the appellant.

challenges for cause. Therefore there was no harm.

## IV. Evidence

The appellant raises several points of error regarding evidence admitted at trial.

## A. Standard of Review

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard.[38] If the ruling is within the zone of reasonable disagreement, an appellate court will not disturb it.[39] When a trial court decides not to exclude the evidence, finding that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, this decision will also be given deference.[40]

## B. Applicable Law

Only relevant evidence is admissible.[41] Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[42] Therefore, to be relevant, evidence must be material and probative.[43] Evidence is material if it is "shown to be addressed to the proof of a material proposition, i.e., any fact that is of consequence to the

---

[38] *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Cr. App. 2003).

[39] *Ibid*.

[40] *Ibid*.

[41] TEX. R. EVID. 402.

[42] TEX. R. EVID. 401.

[43] *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Cr. App. 2001).

determination of the action."[44]

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[45]

**1. Surveillance Video**      In the appellant's thirteenth point of error, he argues the trial court erred in admitting a compilation of images, compiled from security cameras inside the store during the time of the offense, because a proper predicate had not been laid.

Another compilation of images from the same video cameras, showing the same time period during the offense, was admitted into evidence through a different witness as State's Exhibit 101 without objection from the appellant. In these circumstances, no reversible error is presented. "An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection."[46] Appellant's thirteenth point of error is overruled.

**2. "Practice Runs"**    In the appellant's fourteenth point of error, he argues the trial court erred in admitting evidence of "extraneous bad acts the State attributed to appellant that involved so called 'practice runs' for the charged offense." As noted in the State's brief, the appellant does not specifically identify the extraneous bad acts he is complaining about beyond referring to them as "so called practice runs."[47] The Court will assume, as did the State, that this refers to the planning and attempted execution of three separate attempts to rob the convenience store clerk in

---

[44] *Ibid.*

[45] TEX. R. EVID. 403.

[46] *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Cr. App. 2004) (*citing Valle v. State*, 109 S.W.3d 500, 509 (Tex. Cr. App. 2003)).

[47] State's Brief at 97.

the week before the actual offense was committed.

Accomplice-witness Smith testified about several attempts to rob the store clerk, none of which were completed until the morning of Tuesday, March 23, when this offense was committed. A week before the murders, the appellant met Smith and Tim Thomas at a Hooters to plan the robbery for the next morning. Thomas backed out later that night, so the next day, a Wednesday, the appellant and Smith went on a "scouting run" instead. Two days later, on Friday, the appellant brought walkie-talkies to work and announced that the robbery would be committed the following morning, and they would use the walkie-talkies to communicate. But when they arrived Saturday morning, they abandoned their plan because there was an extra employee at the store. The appellant and several accomplices returned Sunday morning and sat outside the convenience store for about two hours before deciding it was too risky to attempt the robbery that day. The robbery and murders ultimately took place on Tuesday, two days later.

This court has held that "evidence of the context of an offense 'is always admissible [because] events do not occur in a vacuum and the jury has a right to have the offense placed in its proper setting so that all the evidence may be realistically evaluated.'"[48] The jury here was authorized to find the appellant guilty as a party under Section 7.02(b)'s conspiracy theory of party liability.[49] Evidence of the planning meeting, "scouting run," and previous attempts was relevant to the jury's determination of whether or not the appellant engaged in a conspiracy with his accomplices and was thus admissible.

---

[48] *Burks v. State*, 876 S.W.2d 877, 900 (Tex. Cr. App. 1994) (*citing Mann v. State*, 718 S.W.2d 741 (Tex. Cr. App. 1987)) (holding that testimony that the appellant solicited help in a robbery a month prior to the charged offense of murder in the course of robbery was admissible as proof of the appellant's plans and preparations, as well as proof of actions within the same transaction as the charged offense).

[49] TEX. PENAL CODE § 7.02(b).

Appellant's fourteenth point of error is overruled.

**3. Possession of a Firearm**    The appellant's point of error fifteen-A[50] is that the trial court erred in admitting evidence that he was in possession of a firearm when he was arrested. A 9mm pistol was found in the appellant's truck after he was arrested in San Antonio, and ballistics testing showed it was not the firearm used in the offense. The appellant argues any probative value of this evidence was outweighed by its potential for prejudice.

"Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."[51] This court will not reverse a conviction for the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the admission of this evidence did not influence the jury, or had but a slight effect."[52] In weighing the probative value of offered evidence under Rule 403, we use the non-exclusive four-factor approach originally set forth by this Court in *Montgomery v. State*:[53]

> (1) how probative the evidence is;
> (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;
> (3) the time the proponent needs to develop the evidence; and
> (4) the proponent's need for the evidence.[54]

Evidence of the gun was presented through a San Antonio police officer who found the

---

[50] Appellant's brief contains two separate points of error labeled Point Fifteen. As noted in State's Brief, at 104 n.9, the appellant and the State agreed to refer to these points as 15a and 15b, and we shall do likewise.

[51] *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Cr. App. 2006).

[52] *Cobb v. State*, 85 S.W.3d 258, 272 (Tex. Cr. App. 2002).

[53] 810 S.W.2d 372, 389-90 (Tex. Cr. App. 1991).

[54] *Shuffield*, 189 S.W.3d, at 787.

firearm in the appellant's truck when it was searched after his arrest. Appellant's possession of the gun was relevant to the State's theory that the appellant disposed of his gun along with his clothes after the murders and then purchased a new gun to replace the weapon used in the offense. The jury heard testimony that the appellant often had a 9mm gun with him, and the day after the murders he asked a co-worker if he knew anyone who was selling a gun. The co-worker directed the appellant to his father. Possession of the firearm was also relevant to show the appellant's consciousness of guilt, in that he armed himself as he fled from Fort Worth.

The photographs of the gun were in no way gruesome, and the jury was aware the appellant had possessed guns in the past. There was no danger of impressing the jury in some irrational way. Furthermore, the evidence took very little time to introduce through the San Antonio police officer, who was already on the stand to testify about the search of the appellant's truck and other items found during that search.

The trial court did not abuse its discretion in admitting evidence regarding the appellant's possession of a firearm when he was arrested, as the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Point of error fifteen-A is overruled.

**4. Text Messages** The appellant's sixteenth point of error is that the trial court erred in admitting text messages sent from the appellant to co-accomplice Chance Smith. He argues that the probability of confusion on a critical issue in the case outweighed any probative value the messages may have had.

This does not comport with the objection made at trial. "In order for an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for

the objection."[55] "An objection stating one legal basis may not be used to support a different legal theory on appeal."[56]

At trial, the text messages were admitted at the guilt phase through the Fort Worth detective who extracted them from Smith's cell phone. During a hearing outside the jury's presence, the following objections were made:

> [DEFENSE COUNSEL]: Well, what we would object to, Judge, is the very first set on Page [sic] 3-6, the 1135 through 1139. And we would object to these, number one, because they're on March the 5th, actually in real time, which is outside of the time that we're restricting here in our motion in limine and motions about extraneous offenses.
> Number two, these – we don't really know what they're even talking about in here from the context of this ...
> ...
> We don't have any idea what they're talking about. And they could be talking about something completely different, especially since it was March 6th [sic] and outside the time period of any kind of planning that we've been able to go into.
> And, quite frankly, Judge, we are a little bit – a whole lot of surprised by this because we were actually told that they weren't going to introduce any of these text messages. And while we have skimmed through them, we haven't gone through them in in-depth [sic] to see if there might be some optional completeness involved. But right now we would object to the Page 86 for the reasons that I've just stated.

After further discussion about what co-accomplice Smith testified to regarding the planning time line and these specific text messages, the following exchange occurred:

> THE COURT: Okay. So I guess – they're entitled to go into these. If your objection is to showing the date, then I would think the remedy for that is to not show the date. But I'm not sure that that's accurate either, so –
>
> [DEFENSE COUNSEL]: Well, now, I think that's even more confusion of the

---

[55] *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Cr. App. 1990); *see* TEX. R. APP. PROC. art. 33.1.

[56] *Rezac*, 782 S.W.2d at 870 (holding an objection based on lack of probable cause does not preserve an argument that the jury may not be able to hear the defendant invoke his right to counsel).

issues for the jury, Judge.

THE COURT: Okay.

[DEFENSE COUNSEL]: Because they're not – they potentially could be sitting there going, well, when was this done, what was this referring to? That's why we were saying that –

THE COURT: Right. His testimony is that it was referring to the robbery at the Valero.

[DEFENSE COUNSEL]: Well, but, again, from the context of Page 86, you don't know what he's referring to.

THE COURT: Well, his testimony was that he was referring to the robbery at the Valero. Okay. ...
[Instructions to the State on how to prepare the actual copy of the messages that would be presented to the jury]
Okay. So let me put this on the record. I'm going to overrule defendant's objections to these three sections of text messages. However, if you want to delay your cross-examination of this witness based upon your surprise that they were offering this, we can do that.

The trial judge appears to have understood and ruled on the appellant's objection to the dates of the text messages. The copy of the text messages that was admitted into evidence and shown to the jury had the dates removed on each message.

On appeal, the appellant now argues that the messages had the potential to confuse the jury because "the messages appeared to relate to bad acts bearing only slight probative value, but were subject to inherently unfair interpretation." This argument does not comport with the objection that was made at trial. The sixteenth point of error is overruled.

## V. Confrontation Clause

The appellant's point of error fifteen-B complains of the trial court's overruling of his objection, based on the Confrontation Clause, to testimony about out-of-court statements made to

Chance Smith by an accomplice. The statements concerned inculpatory items that were said to have been thrown into the river by the appellant.

The Sixth Amendment to the United States Constitution protects an accused's right to be confronted with the witnesses against him in a criminal prosecution. The admission at trial of a testimonial, out-of-court statement is barred by the Confrontation Clause of the Sixth Amendment unless two "demands" of the Clause are met: "unavailability [of the witness] and a prior opportunity for cross-examination."[57] The Sixth Amendment does not bar the admission of non-testimonial hearsay.[58]

While the exact contours of what is testimonial are still being defined by the courts, it has been held that such statements are formal and similar to trial testimony: in other words, those "that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[59] "The primary focus in determining whether an out-of-court statement is 'testimonial' is on the objective purpose of the interview or interrogation, not on the declarant's expectations."[60] Generally, statements made by a co-conspirator in furtherance of the conspiracy are nontestimonial.[61] Although we defer to the trial court's determinations of historical facts and credibility, we review *de novo* the ruling on the

---

[57] *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004).

[58] *Sanchez v. State*, 354 S.W.3d 476, 485 (Tex. Cr. App. 2011).

[59] *Crawford*, 541 U.S., at 52. *See also De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Cr. App. 2008) ("Generally speaking, a hearsay statement is 'testimonial' when the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution.").

[60] *Coronado v. State*, 351 S.W.3d 315, 324 (Tex. Cr. App. 2011).

[61] *See Crawford*, 541 U.S, at 56 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial – for example, business records or *statements in furtherance of a conspiracy*.") (emphasis added).

constitutional question of whether a statement is testimonial or non-testimonial.[62]

Accomplice Chance Smith testified about his conversation with another accomplice,

Randy Seibel, at the car lot five or six hours after the murders:

> Q. [by State]: Did you have any conversation with him about the items that you were supposed to have gotten rid of, the stuff that it was your job to dispose of? Did you ask him about that stuff?
>
> A. Yes. I asked him what they had did [sic] with everything. And he responded that he — or that they had all thrown it away into the river behind [the appellant's] apartment.
>
> Q. When you — what does "everything" mean?
>
> A. Everything would be like the gas can, the clothes they were wearing, the guns involved.

Smith had testified earlier that the appellant said to meet him at an IHOP to get rid of the items that were used in the offense. Smith asked Seibel what happened to the weapon, the clothing, and the gas can in order to determine whether he needed to get those items and dispose of them. That was not an interrogation or interview, and law enforcement was not involved. These statements were not testimonial, and the Confrontation Clause did not make the testimony inadmissible. The appellant's point of error fifteen-B is overruled.

## VI. Prosecutor's Closing Arguments

The appellant brings several points of error about the State's jury arguments at the guilt and punishment stages.

## A. Standard of Review

Generally, jury argument must be (1) summation of the evidence, (2) reasonable

---

[62] *Wall v. State*, 184 S.W.3d 730, 742 & n. 44 (Tex. Cr. App. 2006).

deduction from the evidence, (3) answer to argument of opposing counsel, or (4) a plea for law enforcement.[63]

A trial court's ruling on a motion for mistrial is reviewed for an abuse of discretion.[64] An appellate court will view the evidence in the light most favorable to the trial court's ruling, and the ruling will be upheld if it was within the zone of reasonable disagreement.[65]

To evaluate whether the trial court abused its discretion in denying a mistrial for improper jury argument, we consider the severity of the misconduct (*i.e.*, the prejudicial effect), the measures adopted to cure the misconduct, and the certainty of the same verdict's being returned if there had not been such misconduct.[66] "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required."[67]

## B. Jury Argument at Guilt Phase

The appellant's second point of error complains of the denial of the motion for mistrial he made after his objection was sustained during jury argument at the guilt phase. Referring to the accomplice witness Chance Smith, the prosecutor argued:

> Now, let's talk about Chance. And they've tried every way they can to demonize Chance. And I'll tell you what, you know what, I probably wouldn't buy a car from Chance either. But I've had the benefit to, number one, sit down over time and listen to what Chance has to say and evaluate what Chance has to say.

---

[63] *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Cr. App. 2008).

[64] *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Cr. App. 2009).

[65] *Ibid.*

[66] *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Cr. App. 2004); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Cr. App. 1998).

[67] *Hawkins*, 135 S.W.3d, at 77.

The appellant objected that this was outside the record and "interjected evidence." The court sustained the objection, instructed the jury to disregard the argument, and denied a mistrial.

The prosecutor continued by essentially repeating the argument, saying:

Well, ladies and gentlemen, they suggested that, oh, we just take Chance – we just take Chance at his word and we run with it. Why would the State make a deal with Chance? Well, we sat down and we talked to him, you can see, for a number of hours on many different days.

The appellant did not object.

The appellant also had not objected to the prosecutor's earlier argument that after meeting with the witness for "days, not hours," the State "called him as a witness because he proved to us that he's telling the truth."

"[W]ith two exceptions, the law in Texas requires a party to continue to object each time inadmissible evidence is offered. The two exceptions require counsel to either (1) obtain a running objection, or (2) request a hearing outside the presence of the jury."[68] The same requirement applies to jury arguments. In this instance, because the appellant did not continue to object, did not obtain a running objection, and did not request a hearing outside the presence of the jury, the issue was not preserved for our review.

### C. Jury Argument at Punishment Phase

Points of error eleven and twelve complain of the denial of the appellant's motions for mistrial that were made during argument to the jury in the punishment stage.

**1. Jail Report**.  Several jail officers testified about a razor being found in the appellant's cell. One officer, named Hollie, testified that he had written in a report that he had seen other

---

[68] *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Cr. App. 2003).

inmates throw something into the appellant's cell before the razor was found. The report was not produced in court.

Defense counsel argued that the State's investigators had tried and failed to find such a report and that they were unable to find it because the event had occurred on a different day.

The prosecutor argued that "if [Hollie] saw anything at all, he never, ever wrote a report about it."

The court sustained the appellant's objection to the argument and instructed the jury to disregard, but denied a motion for mistrial. The appellant's eleventh point of error complains of that denial.

The prosecutor then said that defense counsel's argument was correct, that the State had been "checking" for such a report, and "no such report had been made." The court sustained the appellant's objection, instructed the jury to disregard the argument, and denied a motion for mistrial.

Neither denial of a mistrial was a reversible error. The question about the report was tangential to the issue of a razor being found in the appellant's cell. Five other witnesses testified about the finding of such a razor. And the court instructed the jury to disregard the prosecutor's argument about the existence of the report. Such instructions generally cure errors.[69]

The issue for the jury at that stage of the trial was the likelihood that the defendant would continue to commit criminal acts of violence if he were not put to death. In addition to evidence about the appellant's other criminal behavior (setting on fire the house of the owners of the

---

[69] *See Martinez v. State*, 17 S.W.3d 677, 691 (Tex. Cr. App. 2000); *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Cr. App. 1999).

convenience store where he committed the robbery, at a time when they were at home; threatening his wife with a gun and assaulting her by throwing things at her; faking a suicide attempt in an effort to get into a hospital from which he could escape), they had the evidence of the capital murder of which they had just found him guilty. The jury was likely to return the same answer to the special issue without the prosecutor's comments. We hold that the denials of a mistrial were not reversible error.

**2. Mention of Victims' Families**. Points of error 17 and 18 have to do with jury argument at the punishment phase. The State asked for answers to the punishment issues that would lead to a sentence of death because they were "what the law demands. That's what justice demands. That's what these families demand. And, ladies and gentlemen, we have brought you the evidence, and now its time to answer these special issues."

There was no objection. The point was not preserved for review.

The appellant complains of the reference to the families' demand, but his brief does not present a legal argument or cite authority. The point is not adequately briefed.

The appellant complains that his counsel's failure to object was ineffective assistance. As is almost always the case, the appellate record is inadequate to support such a complaint in a case in which there was no motion for new trial on such a ground.[70]

## VII. Indictment

In point of error nine, the appellant complains that the trial court erred in overruling his motion to preclude the imposition of the death penalty because the indictment had no allegations

---

[70] *See, e.g., Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Cr. App. 2003).

about the punishment issues. He acknowledges that this court has rejected this argument.[71] We decline his invitation to reexamine our decisions.

## VIII. Charge on "Society"

In point of error twenty, the appellant complains of the charge at the punishment stage not instructing the jury that the term "society" in the first special issue refers only to prison society. We have repeatedly held that such terms do not require definitions.[72]

Furthermore, the appellant's proposed instruction was incorrect. "This Court's case law has construed the future-dangerousness special issue to ask whether a defendant would constitute a continuing threat 'whether in or out of prison' without regard to how long the defendant would actually spend in prison if sentenced to life."[73]

## IX. Indictment

In points of error six, seven, eight, and ten, the appellant brings constitutional challenges to Texas' death-penalty statutes. Point six argues that the jury should have been instructed to weight aggravating circumstances against mitigating ones. Point seven is that the application of the death-penalty statutes has been arbitrary. Point eight is that Article 37.0711 unconstitutionally fails to place the burden of proof on the State. Point ten is that the jury should have been charged that a hung jury would result in a sentence of life imprisonment. This court has rejected all these

---

[71] *See Freeman*, 340 S.W.3d, at 731; *Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Cr. App. 2007).

[72] *See*, *e.g., Hunter v. State*, 243 S.W.3d 664, 672 (Tex. Cr. App. 2007).

[73] *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Cr. App. 2010); *see also Druery v. State*, 225 S.W.3d 491, 506-507 (Tex. Cr. App. 2007) ("State has the burden of proving beyond a reasonable doubt that there is a probability that [the defendant] would commit criminal acts of violence in the future, so as to constitute a continuing threat, whether in or out of prison.").

arguments.[74]

     The judgment of the criminal district court is affirmed.

Delivered December 11, 2013.

Do not publish

---

[74] *See Saldano v. State*, 232 S.W.3d 77, 107-09 (Tex. Cr. App. 2007); *Threadgill v. State*, 146 S.W.3d 654, 671-73 (Tex. Cr. App. 2004).